IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


SERGIO GONZALEZ, SR.,          )      CASE NO. 1:17-cv-00244


              Plaintiff,      )      JUDGE DONALD C. NUGENT


              v.         )      MAGISTRATE JUDGE
                            KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL    )
SECURITY ADMINISTRATION,    )
                            REPORT AND RECOMMENDATION

              Defendant.    )


Plaintiff Sergio Gonzalez, Sr. ("Plaintiff" or "Gonzalez") seeks judicial review of an unfavorable Disability Insurance Benefits ("DIB") decision of Defendant Commissioner of Social Security ("Commissioner") issued following a remand from the United States District Court for the Northern District of Ohio.  The Commissioner found that Gonzalez was not under a disability within the meaning of the Social Security Act from January 1, 2009, his alleged onset date, through March 31, 2012, his date last insured.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

1

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

On November 29, 2010, Gonzalez protectively filed a DIB application, alleging disability since January 1, 2009.[1]  Tr. 10, 127-133, 143, 401.  Gonzalez's date last insured is March 31, 2012.  Tr. 402, 403.  Gonzalez alleged disability due to bulging discs and arthritis.  Tr. 81, 87, 147.  After initial denial by the state agency (Tr. 81-83) and denial upon reconsideration (Tr. 87-92), Gonzalez requested a hearing (Tr. 93-94).  A hearing was held before Administrative Law Judge Traci M. Hixson ("ALJ") on February 9, 2012.  Tr. 21-63.  On June 12, 2012, the ALJ issued an unfavorable decision (Tr. 7-20), finding that Gonzalez had not been under a disability within the meaning of the Social Security Act from January 1, 2009, through March 31, 2012, the date last insured (Tr. 10, 16-17).  Gonzalez requested review of the ALJ's decision by the Appeals Council.  Tr. 5-6.  On August 20, 2013, the Appeals Council denied Gonzalez request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

On October 22, 2013, Gonzalez filed an appeal with the United States District Court for the Northern District of Ohio.  Tr. 527-528.  On February 18, 2015, the court affirmed in part and remanded in part the Commissioner's decision denying benefits.  Tr. 526-544.  The court affirmed the ALJ's credibility determination (Tr. 540-543) but reversed the ALJ's Step Three finding (Tr.  536-540).  The court found that, "by not discussing the 14.09 listings, the ALJ failed to compare one of Plaintiff's severe impairments, Ankylosing spondylitis, to the listings."  Tr.

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 11/22/2017).

539, 540.  On April 23, 2015, the Appeals Council issued a "Notice of Order of Appeals Council Remanding Case to Administrative Law Judge."  Tr. 523-525.

Pursuant to the remand order, on October 26, 2015, the ALJ conducted an administrative hearing.  Tr. 436-480.  Gonzalez testified and was represented at the hearing by counsel.  Tr. 436, 437.  Vocational expert Gene Burkhammer and medical expert Dr. Arthur Brovender testified at the hearing.  Tr. 436, 437.  On March 2, 2016, the ALJ denied Gonzalez's disability claim.  Tr. 418-435.  On March 14, 2016, Gonzalez filed a motion to vacate the ALJ's March 2, 2016, decision on the basis that it failed to mention or list as exhibits functional assessments from Gonzalez's treating rheumatologist Dr. Raymond S. Hong, M.D., which were submitted within the time period granted by the ALJ.  Tr. 665-666.  Gonzalez also filed an appeal with this Court on May 3, 2016.  *See* Case No. 1:16-cv-01069.  After the appeal was filed, it was discovered that the ALJ had granted Gonzalez's motion to vacate.  See Case No. 1:16-cv-01069, ECF Doc. 14; *see also* Tr. 401.  Thus, per the joint motion of the parties, the court remanded the matter back to the Commissioner for further proceedings.  *Id.*

Thereafter, on December 5, 2016, the ALJ issued an unfavorable decision.  Tr. 395-417.  In her decision, the ALJ determined that Gonzalez was not under a disability within the meaning of the Social Security Act from January 1, 2009, through March 31, 2012, the date last insured.  Tr. 402, 411.  On February 6, 2017, Gonzalez appealed the ALJ's December 5, 2016, decision to this Court.[2]  Doc. 1.

---

[2] 20 C.F.R. § 404.984 provides that, "when a case is remanded by a Federal court for further consideration, the decision of the administrative law judge will become the final decision of the Commissioner after remand on your case unless the Appeals Council assumes jurisdiction of the case."  20 C.F.R. § 404.984(a).  Thus, when a claimant does not file exceptions and the Appeals Council does not assume jurisdiction without exceptions being filed, "the decision of the administrative law judge becomes the final decision of the Commissioner after remand."  20 C.F.R. § 404.984(d).  Neither Gonzalez nor the Commissioner assert that exceptions were filed or that the Appeals Council otherwise assumed jurisdiction.  Thus, the ALJ's December 5, 2016, decision is the final decision of the Commissioner for review by this Court.

## II. Evidence

**A.      Personal, educational, and vocational evidence**

Gonzalez was born in 1966.  Tr. 127, 409, 441.  He lives with his wife.  Tr. 441.  They

have children and grandchildren who visit them.  Tr. 443.  Gonzalez completed school through

the ninth grade.  Tr. 441.  In 2008, Gonzalez was self-employed as a caregiver for an elderly

woman.  Tr. 446.  Gonzalez, his wife, and his daughter provided daily care and companionship

for the woman.  Tr. 446-447.   Prior to the caregiver position, Gonzalez worked in plant

sanitation.  Tr. 447-448.  That work involved climbing in and out of tanks to clean the tanks and

cleaning other equipment throughout the plant.  Tr. 447.  He also worked as a plant sanitation

supervisor and at a machine shop, machining tiny, microscopic parts.  Tr. 448-449.

**B.      Medical evidence**

**1.      Treatment records**

**a.      Medical evidence pre-dating Gonzalez's date last insured**

On January 28, 2010, Gonzalez saw Dr. Kathleen S. Grieser, M.D., of Kaiser

Permanente, with complaints of back and knee pain.  Tr. 207-211.  Gonzalez reported increasing

pain along with some weakness when climbing stairs or attempting to stand up and problems

getting in and out of a car.  Tr. 208.  He also indicated that he had tried over-the-counter

medications but he was not taking any prescription medications.  Tr. 208.  On examination, Dr.

Grieser observed normal straight leg raises, normal strength, normal reflexes, no spine

tenderness, and minimal crepitus in the knees.  Tr. 208-209.  Dr. Grieser also noted that prior

knee x-rays were normal.  Tr. 209; *see also* Tr. 371-372 (September 2009 unremarkable knee x-

rays).  Dr. Grisier ordered a hip and pelvis x-ray and a lumbar spine x-ray.  Tr. 209.  The lumbar

spine x-ray, including obliques, showed mild degenerative joint disease with no joint space

narrowing.  Tr. 211.  The pelvis x-ray was negative.  Tr. 211, 370.  The bilateral hip x-ray

4

showed minimal degenerative joint disease of the hip joints.  Tr. 211, 370.  Gonzalez declined

medication.  Tr. 209.  Dr. Grieser recommended physical therapy.  Tr. 209.

On February 12, 2010, Gonzalez underwent an initial physical therapy evaluation for his

low back and knee pain.  Tr. 215.  He reported pain, disturbed sleep, an inability to sit longer

than 1 hour, and an inability to perform a home exercise program.  Tr. 215.  Gonzalez had a

limited range of trunk motion.  Tr. 215.  Gonzalez also had his first physical therapy session on

February 12, 2010.  Tr. 215-216.  Gonzalez attended 14 physical therapy sessions from February

12, 2010, through April 20, 2010.  Tr. 215-233.  On March 2, 2010, Gonzalez reported feeling a

little better from his prior physical therapy treatment until he shoveled the driveway.  Tr. 221.

On April 16, 2010, Gonzalez reported that his knee was feeling better and his back was about the

same.  Tr. 229.  He noted that there was always some level of pain.  Tr. 229.  On April 20, 2010,

Gonzalez was discharged due to limited progress.  Tr. 231.  He partially achieved some of his

goals – his sleep was still disturbed but he was able to go back to sleep and his pain level was

reduced by 50%.  Tr. 231.  The physical therapists recommended that Gonzalez continue with

home exercises.  Tr. 231.

On July 12, 2010, Gonzalez saw Anita L. Groeschke, a nurse practitioner, for follow up

regarding his back pain.  Tr. 332-335.  Gonzalez complained that he had been having low back

pain for three months.  Tr. 333.  He felt pain and weakness with bending and lifting.  Tr. 333.

He reported no numbness in his legs and no radiation down the legs.  Tr. 333.  Gonzalez was

interested in seeing a specialist and having an MRI.  Tr. 333.  He was not taking any medication

because he did not like taking pills.  Tr. 333.  Nurse Groeschke observed Gonzalez to be in mild

to moderate pain and she observed an antalgic gait.  Tr. 333.  Gonzalez's lumbosacral spine area

revealed no local tenderness or mass but he exhibited painful and reduced lumbosacral range of

motion.  Tr. 334.  Gonzalez's reflexes, motor strength, and sensation were normal.  Tr. 334.  His peripheral pulses were palpable.  Tr. 334.  X-rays taken of Gonzalez's thoracic spine and cervical spine were normal.  Tr. 368-369.   Nurse Groeschke referred Gonzalez to rheumatology.  Tr. 334.  For acute pain, Nurse Groeschke recommended rest, intermittent application of heat, analgesics, and muscle relaxers.  Tr. 334.  Nurse Groeschke also discussed a long-term treatment plan which included use of nonsteroidal anti-inflammatory drugs, a home exercise program, and proper lifting and avoidance of heavy lifting.  Tr. 334.

On August 31, 2010, Gonzalez saw Dr. Raymond S. Hong, M.D., a rheumatologist, for consultation regarding pain in his low back, buttocks, and knees.  Tr. 255-259.  Gonzalez indicated that his pain had been present for over a year on a daily basis.  Tr. 256.  He had attempted physical therapy for his low back, hips, and knees.  Tr. 256.  Physical therapy provided transient relief.  Tr. 256.  Gonzalez's pain levels ranged from 8 out of 10, with 10 being the most severe, to 5 out of 10.  Tr. 256.  Gonzalez indicated that his pain was continuous.  Tr. 256.  Lying down without pillows or lying on the floor helped Gonzalez with his pain.  Tr. 256.  He was using gel on his low back for about 2 hours in the mornings.  Tr. 256.  His low back pain was radiating into his buttocks.  Tr. 256.  He denied joint swelling.  Tr. 256.  He was sleeping about 6 hours per night but usually woke up halfway through the night because of pain.  Tr. 256.  On examination of the musculoskeletal system, Dr. Hong observed no synovitis, tenderness at the sacroiliac joints bilaterally, a positive Schobers's test (10 cm to 13 cm),[3] no restrictions of the

---

[3] Schober's test is "[a] measure of lumbar spine motion in which parallel horizontal lines are drawn 10 cm above and 5 cm below the lumbosacral junction in the erect subject; with maximum forward flexion, the distance between the lines increases at least 5 cm in normal patients but far less in patients with ankylosing spondylitis." https://medical-dictionary.thefreedictionary.com/Schober%27s+test (last visited 11/22/2017).

knee on range of motion, no knee effusions, and rotation of hips caused radiation and pain in the low back. Tr. 257.

Dr. Hong reviewed prior x-rays of the spine, hips, and pelvis. Tr. 258-259. Based on his review of those films, Dr. Hong indicated that there appeared to be a small erosion of the superior anterior aspect of the L4 vertebral body on lateral view and a mild to moderate sclerosis of the bilateral sacroiliac joints but the joints were patent. Tr. 259. Dr. Hong assessment was low back pain. Tr. 259. He noted that Gonzalez had an inadequate response to physical therapy and his situation was "suspicious for a Spondyloarthropathy such as Anklyosing Spondylitis[4] as he had prolonged AM gel of his back pain with buttock radiation and an abnormal Schoeber's [sic] test." Tr. 259. Dr. Hong ordered MRIs of the pelvis and spine. Tr. 259. He continued Gonzalez on ibuprofen and started him on Flexeril. Tr. 259.

The MRIs ordered by Dr. Hong were taken on September 13, 2010. Tr. 272-273. The MRI of the pelvis showed unremarkable appearance of the sacroiliac joints and minimal amount of fluid within the right hip joint. Tr. 272. The MRI of the lumbar spine showed multilevel degenerative changes of the lumbar spine, most prominent at the L4-L5 and L5-S1 levels. Tr. 273. During a September 17, 2010, follow-up telephone call with Gonzalez, Dr. Hong explained that, based on Gonzalez's history, exam and subtle radiographic changes, he "was suspicious for Ankylosing Spondylitis with axial involvement. However, his MRI of the pelvis did not show sacroilitis. His MRI of the lumbar spine show[ed] some facet arthropathy and disc bulging at

---

[4] Ankylosing spondylitis is "a form of degenerative joint disease that affects the spine. It is a systemic illness of unknown etiology, . . . producing pain and stiffness as a result of inflammation of the sacroiliac, intervertebral, and costovertebral joints; paraspinal calcification, with ossification and ankylosis of the spinal joints, may cause complete rigidity of the spine and thorax." *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1754. *See also* https://www.mayoclinic.org/diseases-conditions/ankylosing-spondylitis/symptoms-causes/syc-20354808 (last visited 11/22/2017) ("Ankylosing spondylitis is an inflammatory disease that, over time, can cause some of the vertebrae in your spine to fuse. This fusing makes the spine less flexible and can result in a hunched-forward posture. If ribs are affected, it can be difficult to breathe deeply.").

L5-S1 but no nerve root impingement."  Tr. 252.   Since ibuprofen was not providing Gonzalez

adequate relief, Dr. Hong advised Gonzalez to stop ibuprofen and start a different NSAID –

meloxicam.  Tr. 252.  Dr. Hong advised Gonzalez he would see him in 3 months and if there was

still suspicion for Ankylosing Spondylitis, Dr. Hong would consider anti-TNF drugs.[5]  Tr. 252.

In the interim, Dr. Hong referred Gonzalez to pain management to determine whether he was a

candidate for facet or SI injections.  Tr. 252.

On September 29, 2010, Gonzalez saw Dr. Vasantha K. Kumar, M.D., for a pain

management consultation.  Tr. 245-251.  Gonzalez reported low back pain into both hips and into

his knees.  Tr. 245.  Gonzalez described his pain as sharp and stabbing, "makes you want to drop

to your knees."  Tr. 245.  His lowest pain level was a 2 and his highest was a 10.  Tr. 245.

Precipitating factors included heat, cold, walking, standing, sitting, lying down, lifting and

squatting.  Tr. 245.  Gonzalez indicated that physical therapy was somewhat helpful while he

was at a session but his pain would return the next day.  Tr. 246.  He also indicated that home

exercises were not helpful and the TENS unit was helpful while at physical therapy but his pain

would return the next day.  Tr. 246.  Gonzalez reported that his sleep was fair/poor, indicating he

was able to get 2 hours of uninterrupted sleep.  Tr. 246.  Gonzalez also indicated that his pain

interfered with performance of general activities 50% of the time.  Tr. 247.  On examination, Dr.

Kumar observed an antalgic gait but Gonzalez was able to ambulate without help.  Tr. 248.

Also, on examination, Dr. Kumar observed that Gonzalez's lumbosacral spine area revealed no

local tenderness or mass; there was mild lumbar facet tenderness; myofascial spasm was present

---

[5]  "TNF inhibitors are a type of drug used worldwide to treat inflammatory conditions such as rheumatoid arthritis
(RA), psoriatic arthritis, juvenile arthritis, inflammatory bowel disease (Crohn's and ulcerative colitis), ankylosing
spondylitis, and psoriasis. They reduce inflammation and stop disease progression by targeting an inflammation-
causing substance called Tumor Necrosis Factor (TNF)."  https://www.rheumatology.org/I-Am-A-Patient-
Caregiver/Treatments/TNF-Inhibitors (last visited 11/22/2017).

without trigger points; motor strength was 5/5 in the limbs; sensory was intact to touch and pin prick sensation; straight leg raise was negative; and range of motion was painful on lateral rotation.  Tr. 249.  Dr. Kumar's assessment was degenerative disc (lumbar), radiculopathy (lumbar), foraminal stenosis (lumbar), and spondylosis (lumbar).  Tr. 249.  Dr. Kumar recommended that Gonzalez continue home exercises, undergo a trial for use of a TENS unit at home, continue with NSAIDs and treatment with his rheumatologist, and epidural steroid and facet injections.  Tr. 249.

On October 19, 2010, Gonzalez received his first epidural steroid injection at the L5-S1 level.  Tr. 240-244.  A subsequent nerve block was scheduled for December 22, 2010, but had to be rescheduled because Gonzalez was having flu-like symptoms.  Tr. 238.  The nerve block was rescheduled and, on January 18, 2011, Dr. Kumar administered a L4-L5 transforaminal epidural steroid injection.  Tr. 301.

During a follow-up visit with Dr. Hong on February 11, 2011, Gonzalez reported 80% relief from his first injection at the L5-S1 level and 10% relief from his second injection at the L4-L5 level.  Tr. 295.  Gonzalez continued to complain of low back pain and he reported pain in the left groin.  Tr. 295.  Gonzalez did not feel that the meloxicam was working any better than the ibuprofen he had been taking.  Tr. 295.  He was using gel for an hour in the mornings and he was also using a TENS unit.  Tr. 295.  His highest pain level was a 9/10 and his lowest was a 7/10.  Tr. 295.  On examination, Dr. Hong noted a positive Schober's test (10 cm to 13 cm), a normal occiput-to-wall test,[6] and left groin pain with hip flexion.  Tr. 296.  Dr. Hong's

---

[6] "The Occiput to Wall Distance is a routine clinical test for cervical spine mobility that has been in use for many years. The OWD is measured by having an examinee stand with the back against a wall keeping the posture as straight as possible and with the heels, buttocks and shoulders touching the wall. While looking forward, the examinee also attempts to have the back of the head (the occiput) touch the wall as well. In most normal individuals in this standard position, the occiput will touch the wall and the OWD measurement will be zero. If the occiput does not touch the wall, then the OWD is measured with a goniometer. A value greater than 2 cm. is considered to be abnormal. The OWD may be abnormal in kyphosis (forward curvature of the upper thoracic spine) due to either

assessment was ankylosing spondylitis with axial features and possible enthesopathy, noting that Gonzalez had an inadequate response to two different NSAIDs and lumbar epidural steroid injections. Tr. 297. Dr. Hong recommended that Gonzalez start Enbrel. Tr. 297. Dr. Hong also ordered x-rays of the left hip, lumbosacral spine, and sacroiliac joints. Tr. 297. The x-ray of the hip detected no abnormalities and showed normal bone and joint spaces. Tr. 363. The x-ray of the sacroiliac joints showed minimal degenerative changes suggestive of mild degenerative arthritis. Tr. 363. The lumbosacral spine x-ray showed minimal scoliosis convex to the right and degenerative changes (mild degenerative changes at the disk levels and mild facet degenerative arthritis through the lumbar spine, worse at L5-S1 level). Tr. 363. On March 15, 2011, Dr. Kumar administered another L4-L5 transforaminal epidural steroid injection. Tr. 289-294.

On May 27, 2011, Gonzalez saw Dr. Hong for follow up. Tr. 284-289. Gonzalez indicated that his low back pain restricted him from flexing. Tr. 285. His pain also restricted his ability to get in and out of a car, walk, and ride a bike. Tr. 285. His highest pain level was a 9/10 and his lowest pain level was a 5/10. Tr. 285. He denied joint swelling. 285. He indicated he was using gel in the mornings on his low back for 10 minutes. Tr. 285. Gonzalez reported 1-2 weeks of relief following his March 2011 injection. Tr. 285. Dr. Hong observed that Gonzalez had more peripheral synovitis than in the past and that Gonzalez exhibited limited lumbar spinal expansion and left hip pain. Tr. 287-288. Dr. Hong also noted that Gonzalez had an inadequate response to two different NSAIDs. Tr. 288. Gonzalez had not started Enbrel because he was concerned about potential adverse side effects. Tr. 288. Following additional discussions

---

spondyloarthritis or osteoporosis, as well as in other conditions such as postural instability, congenital spinal deformity and marked obesity." https://wwwn.cdc.gov/nchs/nhanes/2009-2010/ARX_F htm (last visited 11/22/2017).

regarding the medication, Gonzalez was willing to further consider Enbrel but he wanted an orthopedic evaluation prior to making a final decision regarding Enbrel.  Tr. 288.  Dr. Hong provided Gonzalez with an orthopedics referral and a prescription for morphine.  Tr. 287.

On June 8, 2011, Gonzalez saw Dr. Jeffrey C. Kirschman, M.D., for an orthopedic evaluation regarding his ongoing back pain.  Tr. 279-284.  Gonzalez complained of pain with movement of major joints, including knees, shoulders, hands/writs, and back.  Tr. 280.  On examination, Dr. Kirschman observed that Gonzalez had an abnormal, antalgic and stiff gait.  Tr. 281.  Dr. Kirschman indicated that Gonalez's thoracic flexion was 10 degrees and his thoracic rotation was "Right 10 degrees Left 10 degrees."  Tr. 281.  Dr. Kirschman observed no lumbar swelling but noted diffuse lumbar tenderness.  Tr. 281.  Dr. Kirshman indicated that Gonzalez's lumbar flexion was 30 degrees; lumbar extension was 5 degrees; and lateral flexion was "Right 10 degrees Left 10 degrees."  Tr. 281.  Gonzalez had negative straight leg raises.  Tr. 281.  Dr. Kirschman noted that Gonzalez's ability to squat was fair to poor.  Tr. 281.  Gonzalez had slight spasm in his paralumbars.  Tr. 281.  He had 5/5 strength in his lower extremities.  Tr. 281.  Dr. Kirschman reviewed Gonzalez's x-rays and MRI and indicated that Gonzalez's "joint space [was] very adequate and [he was] not a candidate for the surgical intervention at [that] time."  Tr. 282.  He also did not recommend steroid injections.  Tr. 282.  Dr. Kirschman's assessment was ankylosing spondylitis and recommended that Gonzalez follow Dr. Hong's recommendation for Enbrel.  Tr. 281, 282.

During a November 3, 2011, follow-up visit with Dr. Hong, Gonzalez reported that he had tried one dose of Enbrel in July 2011.  Tr. 378.  Gonzalez relayed that he did not take another dose because, following his first dose, he experienced side effects, including nausea, emesis, and headaches.  Tr. 378.  Gonzalez continued to report chronic knee, hip and low back

11

pain. Tr. 378. Gonzalez also reported having pain in his left elbow area for about 4 weeks, which was making it difficult for him to lift. Tr. 378. He was using gel in the mornings on his low back for an hour. Tr. 378. Dr. Hong diagnosed ankylosing spondylitis and lateral epicondylitis. Tr. 380. Dr. Hong suspected that the lateral epicondylitis was related to the ankylosing spondylitis. Tr. 380. Dr. Hong continued to feel that use of anti-TNFs was warranted and discussed the use of Humira versus Remicade. Tr. 380. Dr. Hong administered an injection for Gonzalez's left lateral epicondylitis and Gonzalez agreed to contact Dr. Hong once he made a decision about Humira versus Remicade. Tr. 380-381.

Gonzalez saw Dr. Hong on December 29, 2011. Tr. 374-377. Gonzalez had started Humira. Tr. 374. He had taken two doses, one near Thanksgiving and one on December 15, 2011. Tr. 374. Gonzalez reported some blisters affecting his nostrils, chin, right armpit, trunk and left hip region. Tr. 374. Gonzalez wondered if the blisters were an adverse side effect from the Humira. Tr. 374. He noted though that, at around the time his rash started, he was experiencing upper respiratory symptoms, including a fever, chill, sore throat, and cough. Tr. 374-375. Gonzalez was continuing to have low back pain and knee pain but he had been trying to walk. Tr. 375. Dr. Hong noted that Gonzalez's skin lesions had the appearance of hidradenitis in the right axilla but also noted that the lesions on the thorax and left hip area would be an atypical area. Tr. 377. Thus, Dr. Hong indicated that the lesions could be the result of a skin infection, e.g., staph/strep. Tr. 377. Dr. Hong prescribed an antibiotic and advised Gonzalez not to redose with Humira at that time. Tr. 377.

### b. Medical evidence post-dating Gonzalez's date last insured

On June 18, 2013, Gonzalez saw Dr. Hong for follow up of ankylosing spondylitis. Tr. 776-783. Gonzalez had started on Remicade. Tr. 779. He was tolerating it better than Enbrel

but was not noticing reduced pain on the current dose of 5mg/kg.  Tr. 779.  He had not developed a flare up of hidradenitis while on the Remicade.  Tr. 779.  Gonzalez continued to have hip and back pain.  Tr. 777.  He described his pain as sharp and pinching.  Tr. 777.  He explained that he felt better if he hunched forward when walking, e.g., he felt better leaning on a grocery cart.  Tr. 777.  Gonzalez was also having pain, stiffness, and swelling of his hands.  Tr. 777.  His peak pain level was an 8/10.  Tr. 777.  Dr. Hong continued Gonzalez on Remicade at an increased dose of 7mg/kg.  Tr. 779.  Gonzalez received Remicade infusions on June 25, 2013, and September 17, 2013.  Tr. 783, 798.

In September 2013, Gonzalez saw Dr. Hong for follow up.  Tr. 802-811.  Dr. Hong noted that Gonzalez felt he had less resting peripheral joint pain while on the Remicade but he continued to have significant axial and peripheral pain, especially with activity.  Tr. 809.  On examination, Dr. Hong observed that Gonzalez had synovitis of the finger joints with tenderness; synovitis and tenderness of the right ankle; tenderness at the thoracic and lumbar paraspinals; full range of motion of the cervical spine; and limited lumbar spinal expansion (10 cm to 13 cm).  Tr. 806.  Gonzalez was using a cane.  Tr. 807.  There were no signs of active hidradenitis.  Tr. 807.  Due to an elevated liver function test, Dr. Hong did not increase Gonzalez's Remicade.  Tr. 809.  Dr. Hong recommended continuing with Remicade at the current dose but stopping meloxicam to see if that helped with the elevated liver function test.  Tr. 809.

Gonzalez received a Remicade infusion on October 29, 2013.  Tr. 814-816.  On October 31, 2013, Gonzalez saw Dr. William Schwab, M.D., for a pain management consultation.  Tr. 825-837.  Gonzalez explained that he had pain all over – in his neck, back, knees, hands, finger, and elbows – for three years.  Tr. 825.  He further explained that he had been on several different medications.  Tr. 825.  He was currently on Remicade and using Lidoderm patches on his knees

and lower back.  Tr. 825.  Using the TENS unit helped.  Tr. 825.  Gonzalez characterized his

pain as moderate, aching and sore.  Tr. 825.  His pain was constant in nature and did not cause

weakness but his pain increased with walking and moving too fast.  Tr. 825.  His pain improved

with rest and ice.  Tr. 825.  Gonzalez reported excessive fatigue and confusion.  Tr. 828.  On

examination, Dr. Schwab noted that Gonzalez had sausage shaped fingers with some synovitis;

he had no deformations, pitting, edema, or ankle swelling.  Tr. 828.  Dr. Schwab's assessment

was chronic pain from rheumatoid arthritis and ankylosing spondylitis.  Tr. 829.  Dr. Schwab

prescribed Venlafaxine, advised Gonzalez he could use Voltaren Gel on his hands, recommended

that Gonzalez soak his hands in hot water for pain relief, and recommended that Gonzalez

continue to take Tylenol with codeine as he had been doing.  Tr. 830-831.

In January 2015, Gonzalez was receiving Remicade infusions at an increased dose of

800mg.  Tr. 740.  Gonzalez saw Dr. Hong on January 6, 2015, and relayed that he felt that there

was some improvement but he was still having pain in his hips, knees, and low back.  Tr. 740.

He was using Lidoderm patches as well as Voltaren gel on his knees and back.  Tr. 740.  He

explained that his pain was present if he sat for long periods of time and also worsened with

walking for 30 minutes.  Tr. 740.  On examination, Dr. Hong observed tender bilateral hips with

flexion more than rotation.  Tr. 741.  Dr. Hong also noted that Gonzalez was walking with a

cane.  Tr. 741.  Dr. Hong's diagnoses included ankylosing spondylitis and osteoarthritis of his

lumbar spine.  Tr. 751.  Dr. Hong recommended continued treatment with Remicade and follow

up in six months.  Tr. 751.

Gonzalez saw Dr. Hong on July 7, 2015.  Tr. 977.  He was continuing with his Remicade

treatments.  Tr. 977.  He complained of intermittent right lower extremity pain that had been

worsening over the prior two months.  Tr. 977.  He also continued to report chronic low back

pain and knee and hip pain.  Tr. 977.  On examination, Dr. Hong noted soft tissue swelling in

Gonzalez's fingers, tender low back and sacroiliac joints, and normal motor function of lower

extremities except with hip flexion, which was limited by low back pain.[7]  Tr. 978.  Dr. Hong

ordered a lumbar spine MRI.  Tr. 981.  On August 12, 2015, Dr. Hong explained that the MRI

did not show disc herniation, spinal cord compression, or nerve root compression.  Tr. 981.  Dr.

Hong indicated that Gonzalez had chronic pain syndrome.  Tr. 1008.  Gonzalez had tried various

medications and Dr. Hong indicated that they would try to get authorization for Lyrica.  Tr.

1008.

   On November 3, 2015, Gonzalez saw Dr. Hong for follow regarding ankylosing

spondylitis.  Tr. 1083.  Gonzalez was continuing to receive Remicade treatments every six weeks

Tr. 1083.  Gonzalez reported that the Remicade treatments were reducing his pain for about four

weeks but then he would start to have more pain until his next treatment.  Tr. 1083.  He reported

that he could feel fatigued and "jittery" the day of or the day after a Remicade treatment.  Tr.

1083.  His medications also included Tylenol and Lyrica.  Tr. 1083.  He relayed problems he was

having performing his activities of daily living, e.g., his wife assisted him with washing his feet

and back; he could only walk about 6-8 minutes before needing to sit and rest; and he could

intermittently wash dishes for up to 5 minutes at a time.  Tr. 1083.  Dr. Hong's musculoskeletal

examination findings were as follows:

> Cervical flex - 45 degrees, ext 45 degrees, right lateral flexion 45 degrees, left
> lateral flexion > 45 degrees, right rotation 60 degrees, left rotation 60 degrees. R
> shoulder abduction 120 degrees and flexion 120 degrees.  Left shoulder abduction
> 135 degrees and flexion 135 degrees.  Lumbar flexion 30 degrees.  Lumbar spinal
> expansion 10cm to 12.5cm. Occiput-to-wall O cm. Tender left wrists, MCPs, PIPs
> with swelling of finger PIPs. Tender right wrist, MCPs, PIPs with swelling of finger

---

[7] The physical examination findings reflect pain in low back with straight leg raise and also reflect a negative
straight leg raise.  Tr. 978.

PIPs. Tender bilateral SIs. Intact hip rotation but Tender low back and hips with hip flexion and FABER.

Tr. 1085.  Dr. Hong noted that Gonzalez had a cane.  Tr. 1085.

### 2.    Medical opinions

#### a.    Treating source physician

After Gonzalez's date last insured, Dr. Hong provided a letter dated June 18, 2013, (Tr. 720); completed a pain questionnaire dated November 9, 2015, (Tr. 676);[8] and completed a medical statement regarding ankylosing spondylitis (Tr. 670-671).[9]

*June 18, 2013, letter*

On June 18, 2013, Dr. Hong authored a To Whom it May Concern letter wherein he indicated that Gonzalez was under his care for ankylosing spondylitis and receiving Remicade infusions.  Tr. 720.  Dr. Hong also indicated that, notwithstanding Gonzalez's treatment regimen, Gonzalez had chronic pain in his low back, hips, knees, and hands due to ankylosing spondylitis. Tr. 720.  Further, Dr. Hong indicated that Gonzalez's joint pain limited his ability to function, including restrictions on his walking distance, crouching, kneeling, squatting, crawling and stooping.  Tr. 720.

*November 9, 2015, pain questionnaire*

On November 9, 2015, Dr. Hong completed a pain questionnaire.  Tr. 676.  The title of the pain questionnaire is "Pain Questionnaire Condition Prior 3/31/12 and Continuing."  Tr. 676. (emphasis supplied).  However, the text of the form itself asked Dr. Hong to "provide [his] answers for the time period from 3/31/12 through the present."  Tr. 676 (emphasis in original).

---

[8] The pain questionnaire is also located in the record at Tr. 1014 and Tr. 1098.

[9] The medical statement is also located in the record at Tr. 1017-1018 and Tr. 1094-1096.

Dr. Hong listed ankylosing spondylitis as Gonzalez's impairment.  Tr. 676.  Dr. Hong summarized Gonzalez's subjective complaints as "Joint pain in low back, upper back, hands, shoulders, hips, ankles, feet.  Prolonged morning stiffness.  Fatigue."  Tr. 676.  Dr. Hong stated that he believed that Gonzalez's complaints were reasonably derived from an underlying impairment as established by objective and clinical findings, including synovitis of fingers, limited lumbar spinal expansion, and erosion of lumbar 4 level.  Tr. 676.  Dr. Hong also indicated that the intensity and persistence of Gonzalez's pain affected his ability to perform basic work-related activities, explaining that Gonzalez's chronic pain limited his ability to stand, bend, and ambulate and synovitis of fingers could limit manipulation.  Tr. 676.  Dr. Hong concluded that Gonzalez's pain was severe enough to interfere "often" with his attention and concentration.[10]  Tr. 676.   Dr. Hong felt that Gonzalez was truthful about his perception of pain.  Tr. 676.

### November 9, 2015, medical statement regarding ankylosing spondylitis

Also, on November 9, 2015, Dr. Hong completed a medical statement regarding ankylosing spondylitis.  Tr. 670-671.  The title of the medical statement is "Medical Statement Regarding Ankylosing Spondylitis Condition Prior 3/31/12 and Continuing."  Tr. 670 (emphasis supplied).  However, the text of the form itself asked Dr. Hong to "provide [his] answers to the following for the time period from 3/31/12 through present."  Tr. 670 (emphasis in original).

In the medical statement, Dr. Hong indicated that Gonzalez had back pain, peripheral joint pain, and an inability to ambulate effectively.  Tr. 670.  Dr. Hong was asked about the extent of Gonzalez's ankylosing spondylitis and asked to rate various degrees of flexion from

---

[10] The available choices for rating the level of interference with Gonzalez's attention and concentration were "never," "seldom," "often," "frequently," and "constantly."  Tr. 676.

vertical position.  Tr. 670.  Dr. Hong indicated that Gonzalez had 45 degrees of flexion from vertical position in his cervical spine and 30 degrees of flexion from vertical position in his lumbar spine.  Tr. 670.  Dr. Hong indicated that Gonzalez had severe peripheral arthritis associated with his ankylosing spondylitis and extra-articular manifestations of ankylosing spondylitis in his skin of a moderate degree.  Tr. 670.  Dr. Hong also noted that Gonzalez had significant fatigue and mild malaise.  Tr. 670.  Dr. Hong opined that Gonzalez had the following functional limitations – moderate limitations in activities of daily living, mild limitations in maintaining social functioning, and extreme limitations in completing tasks in a timely manner due to deficiencies in concentrations, persistence and pace.  Tr. 671.  Dr. Hong also opined that Gonzalez could work for less than 1 hour per day; stand at one time for less than 15 minutes; sit at one time for 1 hour; lift 10 pounds on an occasional basis; lift less than 5 pounds on a frequent basis; bend and stoop frequently; occasionally perform fine and gross manipulation bilaterally; and occasionally raise arms over shoulders bilaterally.  Tr. 671.  Dr. Hong opined that Gonzalez's pain was severe.[11]  Tr. 671.

### b.    Consultative examining physician

On March 13, 2012, consultative examining physician Kimberly Togliatti-Trickett, M.D., completed a disability evaluation (Tr. 382-388) and medical source statement of ability to do work-related activities (physical) (Tr. 389-394).

Gonzalez informed Dr. Togliatti-Trickett that he had chronic pain in his low back, spine, left hip and knees.  Tr. 382.  He reported having trouble with bending, lifting and reaching.  Tr. 382.  He indicated he was the most comfortable when lying on his back.  Tr. 382.  Gonzalez

---

[11] The available choices for rating the severity of Gonzalez's pain were "none," "mild," "moderate," "severe," and "extreme."  Tr. 671.

indicated he had been using a cane for the prior two months to help with his lower back pain.  Tr. 382.

On examination, Dr. Togliatti-Trickett observed that Gonzalez was independent with sit to stand without limitation; his gait with within normal limits without the use of a cane; he did not require support for ambulation; he had normal ambulation on heels and antalgia with walking on his toes due to complaints of pain in his lower spine; his squatting and rising were limited due to complaints of pain in the spine;  he had good spinal alignment; he had mild tenderness with palpation over the lumbar spine; his active range of motion of the lumbar spine was limited due to pain in the lumbar region; his cervical spine range of motion showed functional mobility in all planes; his active range of motion was within functional limits in all 4 extremities except for the shoulders bilaterally due to pain; his motor strength was 5/5 in all 4 extremities; he had normal sensation with light touch and pin prick; he had normal hand grasp, manipulation, pinch and fine coordination bilaterally; and he had a negative straight leg raise and slump test[12] bilaterally.  Tr. 383-384, 386-388.

Dr. Togliatti-Trickett's impression was rheumatoid arthritis and ankylosing spondylitis.  Tr. 384.  She opined that Gonzalez was limited functionally due to his subjective complaints of pain.  Tr. 384.  Based on the examination findings, Dr. Togliatti-Trickett found that Gonzalez was able to sit, stand, walk and lift, noting that he had few objective limitations and his subjective complaints of pain outweighed his physical examination findings.  Tr. 384.  She recommended a light or sedentary job.  Tr. 384.

---

[12] A slump test is "A clinical test used to identify sciatica or dural irritation."  https://medical-dictionary.thefreedictionary.com/slump+test (last visited 11/22/2017).

In the medical source statement, Dr. Togliatti-Trickett opined that Gonzalez would be restricted as follows: lifting/carrying up to 20 pounds occasionally[13] and frequently and, up to 10 pounds continuously; sitting at one time without interruption for 30 minutes; standing at one time without interruption for 30 minutes; walking at one time without interruption for 45 minutes; sitting for a total of 3 hours in an 8-hour workday; standing for a total of 3 hours in an 8-hour workday; walking for a total of 3 hours in an 8-hour workday; occasionally reaching overhead bilaterally; frequently reaching in all other directions bilaterally; occasionally climbing stairs, ramps, ladders, or scaffolds; occasionally stooping, kneeling, crouching, or crawling; frequently balancing; and be exposed frequently to unprotected heights and moving mechanical parts.  Tr. 389-393.  Dr. Togliatti-Trickett indicated that Gonzalez had a cane for long distance ambulation and stairs but otherwise did not require a cane to ambulate.  Tr. 390.

### c.      State agency reviewing physicians

On February 24, 2011, state agency reviewing physician Gerald Klyop, M.D., completed a physical RFC assessment, concluding that exertionally Gonzalez could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and push and/or pull unlimitedly, other than as limited for lift and/or carry.  Tr. 67-68.  Dr. Klyop explained the limitations, noting Gonzalez's lumbar MRI abnormalities, an antalgic gait, 5/5 strength, and intact sensation.  Tr. 68.  With respect to postural limitations, Dr. Klyop opined that Gonzalez could frequently climb ramps/stairs; occasionally climb ladder/ramps/scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl.  Tr. 68.  Dr. Klyop opined that Gonzalez should avoid concentrated exposure

---

[13] Dr. Togliatti-Trickett also checked a box indicating that Gonzalez could "never" lift and/or carry 21 to 50 pounds as well a box indicating that Gonzalez could "occasionally" lift and/or carry 21 to 50 pounds.  Tr. 389.

to unprotected heights and moving machinery because of his antalgic gait.  Tr. 68-69.  Dr. Klyop
found no manipulative, visual or communicative limitations.  Tr. 68.

Upon reconsideration, on August 16, 2011, state agency reviewing physician William
Bolz, M.D., affirmed Dr. Klyop's RFC assessment.  Tr. 76-78.

## C.    Plaintiff's testimony

Following the remand order, on October 26, 2015, an administrative hearing was
conducted.  Tr. 436-480.  Gonzalez testified and was represented at the hearing by an attorney.[14]
Tr. 441-462.

Gonzalez stated that, after he stopped working as a caregiver, he started to have a lot of
pain in his spine and knees and his health was declining.  Tr. 449.  He started seeing doctors to
try to figure out what was wrong.  Tr. 449-500.  He tried physical therapy, pain management, and
injections without relief.  Tr. 450.  Gonzalez's doctors have not recommended surgery or
indicated that there was a surgical option to cure ankylosing spondylitis.  Tr. 450, 460.  He tried
various infusion medications, including Humira and Enbrel, and, at the time of the October 2015
hearing, he was receiving Remicade infusions every six weeks, prescribed by Dr. Hong.  Tr. 450,
456.  Gonzalez anticipates requiring Remicade infusions for the rest of his life.  Tr. 456.
Remicade is not a cure but provides some relief of the issues he has relating to his rheumatoid
arthritis and spondylitis.  Tr. 456-457.  At about four weeks after he receives a Remicade
treatment, Gonzalez's aches and pains are more frequent.  Tr. 457.  Side effects from the
Remicade treatments include chills, weakness, and more frequent use of the restroom.  Tr. 458.
Gonzalez also indicates that he experiences symptom flare ups almost every day.  Tr. 457.  He
noted that the number of symptom flare ups has increased over time, with his symptoms being

---

[14] Gonzalez also testified and was represented at the February 9, 2012, hearing.  Tr. 483-510.

worse at the time of the hearing than they were during the 2009 to 2012 time period.  Tr. 457-458.  Gonzalez also takes pain medication and uses a TENS unit.  Tr. 451, 458.  Gonzalez's medications have caused sleepiness, dry mouth, memory loss/forgetfulness, and increased use of the restroom.  Tr. 451, 453-454, 458-459.  Gonzalez also has pain in his arms, elbows, and shoulders and he has swelling in his fingers.  Tr. 451.  Gonzalez's whole body aches – his cervical spine, low back, hips, pelvis, and knees.  Tr. 454.  His ankles and feet swell up.  Tr. 454-455.  He is unable to focus.  Tr. 462.  Gonzalez has problems with his immune system.  Tr. 455.  For example, he has had sinus infections and drainage in his ears.  Tr. 455-456.  Also, he randomly gets a lot of pimples or blisters throughout his body.  Tr. 455-455.  He tries to control his skin problems with antibiotics and/or topical lotions.  Tr. 455.

Gonzalez had been using a cane for a couple of years.  Tr. 452.  He indicated that Dr. Hong had prescribed his cane because his knees buckle at times.  Tr. 452.  Gonzalez estimated that he could carry about 8 pounds with two hands; he could stand for about 15 minutes before feeling uncomfortable and needing to lie down; and he could walk for about 6 minutes before needing to sit down or lean against a wall to take a break.  Tr. 452-453.  Gonzalez gets the most relief when he lies flat on his back with his legs elevated.  Tr. 458.

Gonzalez has his driver's license and is able to drive but does not drive very often.  Tr. 441.  He does not perform many household chores.  Tr. 442.  He has some difficulty maintaining his personal hygiene.  Tr. 442-443.  For example, at times, he needs help from his wife with washing his back and feet.  Tr. 442, 456.  Gonzalez watches television and likes to read.  Tr. 443.  He does not have any hobbies and does not belong to any organizations or clubs.  Tr. 443.  Gonzalez does not attend family gatherings or activities but his children and grandchildren do visit with him at his house.  Tr. 443, 460.  At some time during the 2009 to 2012 time period,

Gonzalez helped his daughter care for his grandson who was four or five years of age at the time. Tr. 443-444.  Sometimes his daughter was there and other times, when she was working, Gonzalez was home with his grandson by himself.  Tr. 444-445.  Gonzalez goes to the store on occasion.  Tr. 442, 445.  If he is in a grocery store, he leans against the cart.  Tr. 442.  He is able to navigate stairs in his home.  Tr. 454.  If Gonzalez needs to reach something from a top shelf, he uses a reacher or grab bar.  Tr. 454.  He is unable to crawl.  Tr. 454.

**D.      Medical expert's testimony**

Medical expert Arthur Brovender, a certified orthopedic surgeon, ("ME") testified at the hearing.  Tr. 462-471,[15] 663.  The ME discussed Gonzalez's medical records and described Gonzalez's medical impairments as found in those records.  Tr. 463-467.  The ME considered various listings, including 14.09, and concluded that Gonzalez's impairments did not meet or equal any listing.  Tr. 467.  The ALJ then asked the ME what he would expect Gonzalez's functional ability to be during the period of 2009 to 2012.  Tr. 467-468.  In response, the ME indicated that he agreed with the consultative examining physician regarding Gonzalez's functional ability except that he believed that Gonzalez could sit longer than 3 hours and he did not think that Gonzalez should crawl.  Tr. 467-469.

In response to questions regarding side effects from medication such as Enbrel, Humira and Remicade, the ME indicated that side effects could occur but he could not discuss specifics regarding the type of side effects because it was not in his field.  Tr. 469-470.  The ME indicated

---

[15] The ME's testimony appears to end on page 36 of the hearing transcript (Tr. 471).  However, page 37 of the hearing transcript is not included in the administrative record.  Per the index of transcript, the VE's testimony starts on page 37 of the hearing transcript (Tr. 437) but it is unclear whether the ME's testimony continues onto any portion of page 37 of the hearing transcript.  In any event, neither party notes that page 37 is not included nor does either party suggest that page 37 of the transcript contains testimony from the ME or VE that would impact the Court's analysis of either party's argument.

though that, if Gonzalez stated that he had flare ups causing his subjective symptoms to worsen, the ME would believe him.  Tr. 471.

The ME indicated that Gonzalez had a diagnosis of ankylosing spondylitis but he had no signs of ankylosing.  Tr. 470.  The ME indicated that he should have something going on in his sacroiliac joints.  Tr. 470.  The ME explained that ankylosing was a technical term for fusion, stating that you get a rigid spine, a bamboo spine, and opining that Gonzalez had no signs of that. Tr. 470.  The ME further noted that Gonzalez had complaints of pain in his knees but his x-rays were all normal and his major joints were not affected.  Tr. 470.  The ME acknowledged that the condition of ankylosing spondylitis fell more within then field of rheumatology than within the ME's own field of expertise.  Tr. 471.  The ME also indicated that, if he was treating a patient and suspected ankylosing spondylitis, he would refer the patient to a rheumatologist.  Tr. 471.

**E.      Vocational expert's testimony**

Vocational expert Gene Burkhammer ("VE") testified at the hearing.  Tr.  437, 472-476, 656.  The VE classified Gonzalez's past work.  Tr. 472-473.  The ALJ then asked the VE to assume a hypothetical individual between the ages of 42 and 45 with the same education as Gonzalez who is able to lift and carry up to 10 pounds frequently and 20 pounds occasionally; is able to sit for 3 hours, stand for 3 hours, and walk for 3 hours in an 8-hour workday; is able to occasionally reach overhead; is able to frequently reach in all directions; is able to handle, finger, feel, push and pull; is able to operate foot controls; is able to occasionally climb stairs and ramps; cannot climb ladders, ropes, or scaffolding; is able to frequently balance, and occasionally stoop, kneel, crouch but not crawl; should avoid hazardous conditions such as unprotected heights and moving machinery; and should avoid extreme temperatures and humidity.  Tr. 473-474.  The VE indicated that the described individual would be unable to perform Gonzalez's past work.  Tr. 474.  The VE indicated that there were light, unskilled jobs in the regional or national economy

that the described individual could perform, including housekeeping cleaner, mail clerk, and sales attendant.[16]  Tr. 474-475.

The ALJ then altered the first hypothetical slightly by limiting the individual to only lifting and carrying 10 pounds on an occasional basis and standing and walking for 2 hours and sitting for 6 hours in an 8-hour workday with a sit-stand option every hour (all other limitations from the first hypothetical remained the same).  Tr. 475.  The VE indicated that there would be sedentary jobs available for the described individual, including document specialist, food and beverage order clerk, and bench assembler.[17]  Tr. 475-476.

The ALJ then asked the VE whether the need for up to four additional 15 minute unscheduled breaks each day would impact the availability of the jobs previously identified by the VE.  Tr. 476.  With that additional limitation, the VE indicated that all work would be eliminated.  Tr. 476.

In response to additional questioning by the ALJ, the VE indicated that his testimony was consistent with the DOT and explained that, while sit-stand options and breaks are not addressed in the DOT, his testimony regarding those matters was based on his experience and collaboration with other professionals in the field.  Tr. 476.

Gonzalez's counsel posed no questions to the VE.  Tr. 476.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

---

[16] The VE provided national job incidence data for each of the identified jobs.  Tr. 474-475.

[17] The VE provided national job incidence data for each of the identified jobs.  Tr. 475-476.

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work- but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

26

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her December 5, 2016, decision, the ALJ made the following findings:[18]

1.   Gonzalez last met the insured status requirements of the Social Security Act on March 31, 2012.  Tr. 403.

2.   Gonzalez did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 2009, through his date last insured of March 31, 2012.  Tr. 403.

3.   Through his date last insured, Gonzalez had the following severe impairments: ankylosing spondylitis, degenerative joint and disc disease of the lumbar spine, left epicondylitis, and obesity.  Tr. 403-404.

4.   Through the date last insured, Gonzalez did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments, including listings 1.02(B), 1.04, and 14.09(C).  Tr. 404-405.

5.   Through his date last insured, Gonzalez had the RFC to lift and carry up to 10 pounds frequently and 20 pounds occasionally; he was able to sit for 3 hours, stand for 3 hours, and walk for 3 hours in an 8-hour day; he was able to occasionally reach overhead; he could frequently reach in all other directions; he could handle, finger, feel, push and pull; he could operate foot controls; he could occasionally climb stairs and ramps, but no ladders, ropes, or scaffolding; he could frequently balance, and occasionally stoop, kneel, or crouch, but not crawl; he should avoid conditions such as unprotected heights and moving machinery; and he was precluded from extreme temperatures and humidity.  Tr. 405-409.

6.   Through his date last insured, Gonzalez was unable to perform any past relevant work.  Tr. 409.

7.   Gonzalez was born in 1966 and he was 45 years old, defined as a younger individual age 18-49, on the date last insured.  Tr. 409.

8.   Gonzalez has a limited education and is able to communicate in English. Tr. 409.

9.   Transferability of job skills was not material to the determination of disability.  Tr. 409.

---

[18] The ALJ's findings are summarized.

10.  Through the date last insured, considering Gonzalez's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Gonzalez could have performed, including housekeeping cleaner, mail clerk, and sales attendant.  Tr. 409-410.

Based on the foregoing, the ALJ determined that Gonzalez was not under a disability from January 1, 2009, the alleged onset date, through March 31, 2012, the date last insured. Tr. 411.

### V. Parties' Arguments

Gonzalez argues that: (1) the ALJ's Step Three determination that his ankylosing spondylitis did not meet Listing 14.09 is not supported by substantial evidence; (2) the ALJ violated the law-of-the-case doctrine by improperly considering his conditions under Listing 14.09 in violation of the earlier district court's remand order; (3) the ALJ violated the treating physician rule with respect to Dr. Hong's medical opinions; (4) the ALJ's analysis of the ME's opinion is not supported by substantial evidence; and (5) the ALJ's Step Five determination is not supported by substantial evidence.  Doc. 12, pp. 15, 16-24; Doc. 15.

In response, the Commissioner argues that no error occurred and the Commissioner's decision is supported by substantial evidence and should be affirmed.  Doc. 14, pp. 10-21.

### VI. Law & Analysis

#### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial

evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir.

2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case de novo, nor resolve conflicts in evidence, nor decide

questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if

substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a

reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence

also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469,

477 (6th Cir. 2003).

**B.     The Court should find that the ALJ did not err at Step Three**

Gonzalez contends that the ALJ erred at Step Three by not fining that his impairment met

the requirements of Listing 14.09(C) prior to his March 31, 2012, date last insured.[19]

At Step Three of the disability evaluation process, a claimant will be found disabled if his

impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. §

404.1520(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or

equals a Listing.  *Thacker v. SSA*, 93 Fed. Appx. 725, 727-728 (6th Cir. 2004) (citing *Buress v.

Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).  Thus, a claimant "must

present specific medical findings that satisfy the various tests listed in the description of the

applicable impairment or present medical evidence which describes how the impairment has

---

[19] The undersigned observes that in Gonzalez's 2013 appeal to this district court, which resulted in a remand order, Gonzalez argued that the ALJ erred by not considering whether his impairment met or equaled Listing 14.09(D). *See Gonzalez v. Comm'r of Soc. Sec.*, 2015 WL 687850, * 6 (N.D. Ohio Feb. 18, 2015).  He now argues that his impairment satisfies Listing 14.09(C).  The Commissioner does not argue that Plaintiff should be precluded from arguing that a different subsection of Listing 14.09 is satisfied.

such equivalency." *Thacker* 93 Fed. Appx. at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)).  "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing.'"  *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011).  "A claimant must satisfy all the criteria to 'meet' the listing."  *Id.*  "[A]claimant is also disabled if her impairment is the *medical equivalent* of a listing[.]"  *Id.*  (emphasis in original).  "An administrative law judge must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment."  *Id.*  In assessing equivalency, an ALJ "looks to the opinions of the state agency medical advisors and/or the opinion of a testifying medical expert for guidance on the issue of whether the medical findings are at least equal in severity and duration of the listing findings."  *Johnson v. Colvin*, 2014 WL 1418142, *3 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. § 404.1526).

As set forth in the Listings, 14.09(C) provides as follows:

14.09 Inflammatory arthritis.  As described in 14.00D6.  With:

***

C. Ankylosing spondylitis or other spondyloarthropathies, with:

1. Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 45° or more of flexion from the vertical position (zero degrees); or

2. Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 30° or more of flexion (but less than 45°) measured from the vertical position (zero degrees), and involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity.[20]

---

[20] "Major organ or body system involvement can include: Respiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis, vasculitis), renal (glomerulonephritis), hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition ("lupus

20 C.F.R. Pt. 404, Supbt. P, App.1, Listing 14.09.

At Step Three, the ALJ analyzed Gonzalez's impairments under various listings, including 14.09(C), and concluded that Gonzalez did not have an impairment or combination of impairments that met or equaled the criteria for any listed impairment.  Tr. 404-405.  With respect to Listing 14.09(C), the ALJ stated:

> Likewise, the severity of the claimant's ankylosing spondylitis did not meet or medically equal listing 14.09(C).  There is no evidence indicating the claimant had ankylosis (fixation) of the dorsolumbar or cervical spine at all prior to his date last insured, and he certainly did not have fixation at 30 degrees or more of flexion measured from the vertical position (zero degrees) prior to his date last insured (Exhibits 1F; 3F-6F).

Tr. 405.

Gonzalez contends that the ALJ's finding is in error because there is evidence of ankylosis (fixation) in the record.  He points to a range of motion physical examination finding from an exam conducted by Dr. Kirschman on June 8, 2011, (Tr. 281, lumbar flexion 30°), and from a physical examination conducted by Dr. Togliatti-Trickett on March 13, 2012, (Tr. 387, dorsolumbar range of motion on flexion 40°, normal 90°).  He also relies on a November 9, 2015, opinion from Dr. Hong setting forth degrees of flexion of the cervical (45°) and lumbar spine (30°) from a vertical position.  Tr. 670.

The Commissioner asserts that range of motion testing is not the same as testing for fixation and therefore the range of motion test results are not relevant to whether Listing 14.09(C) is met.  Gonzalez disagrees and contends that range of motion testing is relevant and an appropriate physical examination measurement of fixation.  It is not necessary for this Court to reach the issue of whether range of motion testing is an appropriate means of assessing fixation

---

fog"), mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis)." 20 C.F.R. Pt. 404, Supbt. P, App.1, Listing 14.00D1a.

under Listing 14.09(C) because ankylosis (fixation) must be shown by ". . . *appropriate*

*medically acceptable imaging and measured on physical examination . . .*"  20 C.F.R. Pt. 404,

Supbt. P, App.1, Listing 14.09(C) (emphasis supplied).  Thus, the listing requires objective

imaging and physical examination findings.  Gonzalez points to a diagnosis of ankylosis

spondylitis and range of motion testing to establish fixation.  However, he has not shown

evidence of fixation as shown by "appropriate medically acceptable imaging."  Furthermore,

during the hearing, Dr. Brovender discussed in detail medical evidence, including MRI and x-ray

results, and testified that:

> [T]here's no ankylosing of anything.  When you look at the – he should have something going on in his sacroiliac joints, either a fusion.  He should have - - of his arms, and his spine.  He should have ankylosis which is a technical term for fusion.  You get a rigid spine, a bamboo spine.  He has none of that.  He has complaints of pain in his knees, and his x-rays are all normal.  They talk about major joints but his major joints are not affected.

Tr. 470.

This opinion, which the ALJ provided considerable evidentiary weight to (Tr. 407),[21]

supports the ALJ's conclusion that Listing 14.09(C) was not satisfied because there was no

evidence of ankylosis (fixation) prior to the date last insured (Tr. 405).  Dr. Brovender's

description of ankylosis (fixation) is consistent with Dr. Kirschman's June 8, 2011, after-care

summary, which states, in part, "Ankylosing spondylitis . . . is a form of arthritis that causes pain

and stiffness mostly of your neck and back but sometimes of your chest or other joints . . . Over

time, joints in the spine can grow together, or fuse, and cause you to bend forward in a fixed

position." Tr. 282-283 (emphasis supplied).  Additionally, the ALJ considered various range of

motion testing as well as the objective imaging (Tr. 406-407, 408) and found no evidence

---

[21] Gonzalez's claim that the ALJ erred with respect to her analysis of Dr. Brovender's medical opinion is addressed below.

indicating that Gonzalez's ankylosing spondylitis caused fixation of the dorsolumbar or cervical spine during the relevant time period (Tr. 407) and it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.

For the reasons set forth above, the undersigned recommends that the Court conclude that the ALJ did not err at Step Three.

## C.      The Court should find that the ALJ did not violate the law-of-the-case doctrine

Gonzalez argues that the ALJ violated the law-of-the-case doctrine by improperly considering his impairments under Listing 14.09.  As Gonzalez states, his "case was previously remanded to determine whether Mr. Gonzalez's ankylosing spondylitis met any part of Listing 14.09." Doc. 12, p. 16.  Gonzalez argued that his impairments satisfied Listing 14.09(C).  The ALJ considered Gonzalez's impairments under Listing 14.09 and found that his impairments did not meet or equal Listing 14.09(C).  Further, as discussed above, the undersigned recommends that the Court find no error with respect to the ALJ's Step Three finding.   Accordingly, the undersigned recommends that the Court reject Gonzalez's argument that the ALJ violated the law-of-the-case doctrine by improperly considering his impairments under Listing 14.09.

## D.      The Court should find no violation of the treating physician rule

Gonzalez argues that the ALJ violated the treating physician rule because she did not provide good reasons for assigning partial weight to Dr. Hong's November 9, 2015, opinions.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d

365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c). An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

In discussing the evidence, the ALJ provided a detailed discussion of Dr. Hong's November 9, 2015, opinions and explained the weight assigned. Tr. 408-409. The ALJ stated:

> Claimant also submitted more recent opinions provided by Dr. Hong. Dr. Hong noted claimant's subjective complaints consist of joint pain in the low back, upper back, hands shoulders, hips, ankles and feet with prolonged morning stiffness. He also noted synovitis of fingers and limited lumbar spinal expansion. It is Dr. Hong's opinion that claimant's chronic pain limits his ability to stand, bend, ambulate and that synovitis of fingers can limit manipulation (Exhibit 12F). The undersigned acknowledges that the evidence demonstrates some progression in claimant's condition, however, these limitations occurred after claimant's date last insured. For example, at the consultative examination on March 13, 2012, shortly before claimant's date last insured, a general inspection of his posture showed good spinal alignment, mild tenderness with palpation over the lumbar spine. Claimant was muscular overall, but lumbar spine range of motion was limited due to pain. Cervical spine range of motion showed functional mobility in all planes. Range of motion was within functional limits in all four extremities except the shoulders. No

lower extremity edema was present.  Inspection of the joints of the hands, wrists, elbows, knees and ankles did not reveal joint erythema, effusion, tenderness, or abnormalities.  Motor strength was 5/5 in all four extremities and claimant had normal sensation, normal hand grasp, manipulation, pinch and fine coordination bilaterally (Exhibit 6F/3).

Dr. Hong further opined claimant had severe peripheral arthritis associated with claimant's ankylosing spondylitis (Exhibit 13F/2).  Upon examination in November 2011, Dr. Hong only noted tender right PIPs, tender left lateral epicondyle, tender left MCPs and PIPs and synovitis of right thumb.  There was small effusion in the right knee (Exhibit 5F/7). These findings are not consistent with severe arthritis.  Moreover, imaging did not show severe arthritis.  X-rays showed mild degenerative joint disease in the lumbar spine, right and left hips, and none in the pelvis and knees (Exhibit 4F/96-97).  Dr. Hong further noted claimant could only work one hour per day, with the ability to sit for 60 minutes and stand for less than 15 minutes.  Dr. Hong opined claimant could lift 10 pounds occasionally, frequently bend, stoop and occasionally finger, handle, and reach overhead (Exhibit 13F/3).

Although these opinions were rendered more than three years after claimant's date last insured [,] [t]he undersigned has given them partial weight.  As noted, however, the treatment records that are contemporaneous with the date last insured, do not demonstrate[] the severity of limitation as noted in Dr. Hong's most recent opinions.

Tr. 408-409.

The ALJ's decision leaves no doubt as to the weight assigned or the reasons for the weight assigned to Dr. Hong's opinions.  Gonzalez contends that the ALJ's reasoning is faulty because the physical examination findings of Dr. Kirschman and Dr. Togliatti-Trickett show listing-level ankylosis that is consistent with Dr. Hong's November 2015 opinions.  However, neither Dr. Kirschman nor Dr. Togliatti-Trickett opined that Gonzalez had a listing level impairment.  In fact, Dr. Togliatti-Trickett found that Gonzalez was "limited by his subjective complaints of pain which outweigh his physical exam findings noted today[,]" and she indicated that, if Gonzalez returned to gainful employment, "a light or sedentary job would be recommended."  Tr. 384.  Additionally, the ALJ considered the evidence and explained in detail why the evidence pre-dating Gonzalez's date last insured did not demonstrate the severity of limitations included in Dr. Hong's opinions that were rendered more than three years after

Gonzalez's date last insured.[22]   Moreover, as indicated above, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."   *Garner*, 745 F.2d at 387.

Based on the foregoing, the undersigned concludes that the ALJ sufficiently complied with the treating physician rule and, therefore, recommends that the Court find no error with the ALJ's consideration of Dr. Hong's opinions.

**E.      The Court should find no error with the ALJ's consideration of and weighing of Dr. Brovender's medical expert opinion**

Gonzalez argues that the ALJ improperly provided considerable evidentiary weight to the opinion of Dr. Brovender, the ME, because the ALJ's statement that "[t]here is no evidence indicating the claimant's ankylosing spondylitis caused fixation of the claimant's dorsolumbar or cervical spine during the relevant time period," was inaccurate and Dr. Brovender was not a rheumatologist, he was unfamiliar with Gonzalez's medications, and he unduly focused on radiology findings instead of the systemic nature of ankylosing spondylitis.

In weighing Dr. Brovender's opinion, the ALJ stated:

> Likewise,[[23]] the opinion of Dr. Brovender (testimony), the impartial medical expert, has been given considerable evidentiary weight to the extent it is consistent with the findings herein. This opinion is also within the purview of his expertise. Further, Dr. Brovender had the benefit of reviewing the entire record and hearing the claimant's testimony prior to rendering his opinion. There is no evidence indicating the claimant's ankylosing spondylitis caused fixation of the claimant's dorsolumbar or cervical spine during the relevant time period (Exhibits 1F-6F).  He also remained neurologically intact, with normal strength and sensation in his extremities (Exhibits 1F; 3F; 4F; 6F).

Tr. 407.

---

[22] To the extent that Gonzalez asserts that Dr. Hong's November 2015 opinions relate back to the period prior to his date last insured, Dr. Hong's opinions do not clearly relate back to that period.  For example, the forms completed by Dr. Hong state at the top "condition prior to 3/31/12 and continuing" but they also state "please provide your answers to the following for the time period from 3/31/12 through the present."  Tr. 670, 676 (emphasis in original).

[23] The ALJ also assigned considerable evidentiary weight to the state agency reviewing physicians' opinions.  Tr. 407.  Gonzalez does not challenge the ALJ's weighing of the state agency reviewing physicians' opinions.

With respect to Gonzalez's claim that the ALJ erred by concluding that there was no evidence that Gonzalez's ankylosing spondylitis caused fixation during the relevant period, this argument was previously found to be without merit in connection with Gonzalez's Step Three argument.

Gonzalez has failed to show that the ALJ erred by providing weight to Dr. Brovender's opinion because he is not a rheumatologist.  Although not a rheumalologist, Dr. Brovender is an orthopedic surgeon and, prior to rendering his opinion, he reviewed the record pertaining to the relevant time period.  The undersigned also notes that Gonzalez himself relies upon physical examination findings rendered by a medical doctor who practices in orthopedic medicine: namely, Dr. Kirschman.  Tr. 282.

While Dr. Brovender acknowledged that he was unfamiliar with the medications that Gonzalez was taking, Gonzalez has not shown that the ALJ was barred from considering and relying on Dr. Brovender's opinions regarding the meaning of ankylosis and/or what imaging tests would show in someone who had developed ankylosis, i.e., fusion, rigid spine, bamboo spine.  Tr. 470.

Finally, Gonzalez's claim that the weight the ALJ assigned to Dr. Brovender's opinion is not supported by substantial evidence because Dr. Brovender unduly focused on radiology findings is without merit.  Listing 14.09(C) specifically requires that ankylosis (fixation) be shown by appropriate medically acceptable imaging.  Thus, it was appropriate for Dr. Brovender to focus on radiology findings.

For the reasons discussed herein, the undersigned recommends that the Court find no error with the ALJ's weighing of and reliance on Dr. Brovender's medical opinion.

**F.     The Court should find the ALJ's Step Five determination supported by substantial evidence**

Gonzalez argues that the ALJ erred in relying on the VE's testimony identifying the jobs of housekeeping cleaner, mail clerk and sales attendant to support her Step Five determination. He asserts that the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* ("SCO"), a companion publication to the *Dictionary of Occupational Titles* ("DOT"), SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000), indicates that the three jobs require frequent reaching but that the RFC limits Gonzalez to occasional overhead reaching. Thus, he contends the RFC precludes the identified jobs, arguing that someone who is capable of only occasional reaching would be unable to perform jobs that required frequent reaching. Gonzalez argues that there is an inconsistency between the job requirements as set forth in the SCO and the RFC that was not resolved at the hearing or in the ALJ's decision and therefore the ALJ was barred from relying on the jobs to support her Step Five determination.

The ALJ's RFC limits Gonzalez to occasional overhead reaching but also indicates that he can perform frequent reaching in all other directions. While the jobs identified by the VE require frequent reaching, they do not specifically require overhead reaching. *See e.g., Free v. SSA*, 690 Fed. Appx. 394, 396 (6th Cir. 2017).

Additionally, although SSR 00-4p indicates that an ALJ shall "identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs and VSs and information in the . . . [DOT] . . . the ALJ's duty is satisfied if he or she asks the VE whether his or her testimony is consistent with the DOT." *See Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx. 498, 508 (6th Cir. 2013) (alterations in original) (internal citations omitted); *see also Beinlich v. Comm'r of Soc. Sec.*, 534 Fed. Appx. 163, 168 (6th Cir. 2009) (finding that the "ALJ fully complied with SSR 00-4p when he asked the VE whether there was 'any discrepancy

between her opinions that the DOT standards for the requirements of the jobs she named.'").
Here, the ALJ specifically inquired as to whether the VE's testimony was consistent with the
DOT (Tr. 476), the VE confirmed that his testimony was consistent with the DOT,[24] (Tr. 476)
and the ALJ determined that the VE's testimony was consistent with the DOT (Tr. 410).  Thus,
the ALJ satisfied her duty under SSR 00-4p.

Moreover, "nothing in applicable Social Security regulations requires the [ALJ] to
conduct . . . her own investigation into the testimony of a [VE] to determine its accuracy,
especially when the claimant fails to bring any conflict to the attention of the [ALJ]."  *See
Ledford v. Astrue*, 311 Fed. Appx. 746, 757 (6th Cir. 2008); *see also Beinlich*, 345 Fed. Appx. at
168 (finding that, "[e]ven if there were an inconsistency, the plaintiff has not pointed to any
authority that the ALJ erred in his findings based on the VE's testimony, which went
unchallenged by the plaintiff until after the ALJ issued his decision.").  Further, "neither the
testimony of a [VE] nor the occupational descriptions in the DOT necessarily trumps the other."
*Ledford*, 311 Fed. Appx. at 757.  At the hearing, Gonzalez did not question the VE or bring to
the ALJ's attention an alleged conflict between the job descriptions in the DOT and the VE's
testimony.  Tr. 476.  His attempt to now raise such a challenge should be rejected.

For the reasons set forth herein, the undersigned recommends that the Court find that the
ALJ properly relied upon the VE's testimony and that the ALJ's Step Five determination is
supported by substantial evidence.

---

[24] Since sit-stand options are not addressed in the DOT, the VE indicated that his testimony on that issue was based
on his experience and collaboration with other professionals in the field.  Tr. 476.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.

November 22, 2017

Kathleen B. Burke
United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).